**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
DR. CHINWE OFFOR,

                                        Plaintiff,


            -against-                                          **MEMORANDUM OF**
                                                              **DECISION & ORDER**
MERCY MEDICAL CENTER, ROCKVILLE CENTRE                         15-cv-2219 (ADS)(SIL)
DIVISION, CATHOLIC HEALTH SERVICES OF LONG
ISLAND, DR. SWARNA DEVARAJAN, and
DR. JOHN P REILLY,

                                        Defendants.
-------------------------------------------------------------------X


**Ike Agwuegbo, Esq.**
*Attorney for the Plaintiff*
575 Lexington Avenue, 4th Floor
New York, NY 10022


**Nixon Peabody LLP**
*Attorneys for the Defendants*
50 Jericho Quadrangle, Suite 300
Jericho, NY 11753
            By: Christopher G. Gegwich, Esq.
                Tony Garbis Dulgerian, Esq., Of Counsel


**SPATT, District Judge**.

        This case arises from allegations by the Plaintiff Dr. Chinwe Offor (the "Plaintiff"), who is an

African American born in Nigeria, that she was discriminated against while working as a

Neonatologist at Mercy Medical Center ("MMC").

        On April 20, 2015, the Plaintiff commenced this action against the Defendants MMC, Catholic

Health Services of Long Island, Inc. ("CHSLI"), Dr. Swarna Devarajan, and Dr. John P. Reilly

(collectively, the "Defendants").  She asserted the following causes of action:  (i) national origin and

race discrimination pursuant to 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the New York State Human Rights Law, N.Y. Exec.

Law § 296(1) ("NYSHRL"); (ii) retaliation under Title VII; (iii) violation of the Family and Medical

Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"); and (iv) "libel, slander, and intentional infliction of emotional distress."

On May 15, 2015, the Plaintiff filed an amended complaint as a matter of course pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 15(a)(1)(A).

Presently before the Court is (i) a motion by the Defendants pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the amended complaint in its entirety; (ii) a cross-motion by the Plaintiff to amend her complaint for a second time pursuant to Fed. R. Civ. P. 15(a)(2); (iii) a motion by the Defendants to seal certain documents attached to the original and first amended complaint**;** and (iv) cross-motions by the parties for sanctions.

For the reasons set forth below, the Court (i) grants the Defendants' motion to dismiss; (ii) denies the Plaintiff's motion to amend; and (iii) grants the Defendants' motion to seal.  As the parties' filed cross motions for sanctions several months after filing the three above-motions, the Court reserves decision on the sanctions' motions for administrative reasons

## I. BACKGROUND

The following facts are drawn from the proposed second amended complaint ("SAC") and construed in the light most favorable to the Plaintiff.

### A. The Parties

The Plaintiff is a resident of Dix Hills and was employed by the Defendant MMC from February 1, 2000 until August 21, 2014, when MMC terminated her employment.  (SAC at ¶ 1.)  She was initially hired at MMC as an attending Neonatologist in 2004.  (Id. at ¶ 15.)  Although not made explicit in the SAC, the allegations suggest her role as a Neonatologist was to provide healthcare for newborn babies.  In 2004, she was promoted to the title of Assistant Director of Neonatology at MMC. (Id. at ¶ 16.)

The Defendant MMC is a hospital located in Rockville Centre, New York.  (Id. at ¶ 2.)

The Defendant CHSLI is a "parent institution" of MMC and is located in Long Island, New York.  (Id. at ¶ 3.)

The Defendant Dr. Devarajan was the Chairwoman of Pediatrics and the Director of Neonatology & Newborn Services at MMC.  (Id. at ¶ 4.)  She was the Plaintiff's immediate supervisor during the entire period of the Plaintiff's employment at MMC.  (See id.)

The Defendant Dr. Reilly is the Chief Medical Officer of MMC.  (Id. at ¶ 5.)  He also supervised the Plaintiff during the period of her employment at MMC.  (See id.)

## B. The Alleged Denial of Moonlighting Hours

The Plaintiff alleges that from 2006 to 2010, the Defendant Dr. Devarajan discriminated against her on the basis of her race and national origin because she denied the Plaintiff additional so-called "moonlighting" hours, which are night and weekend hours that doctors in MMC's Neonatal Intensive Care Unit ("NICU") work in addition to their regularly scheduled work hours and for which they receive additional compensation.  She further alleges:

> [E]xternal moonlighters (mostly and predominantly of Indian Descent) never had any issues with Dr. Devarajan regarding availability of moonlighting hours.  In fact, Dr. Devarajan usually offered these Doctors more hours than they could handle.  In one email, whilst thanking one of the Moonlighters for helping her son 'Alex' with a job . . . , Dr. Devarajan offered him as many moonlighting hours as he could handle.

(SAC at ¶ 22.)

In support of this allegation, the Plaintiff attached to the proposed SAC, an August 29, 2011 email she sent to Nancy Simmons ("Simmons"), an Executive Vice President at MMC.  (See SAC, Ex. 3(A), Dkt. No. 22–9, at 21.)  In the email, the Plaintiff summarizes a meeting she had with the Defendants Dr. Reilly and Dr. Devarajan on August 25, 2011 to request additional moonlighting hours. (Id.)  According to her email, at the meeting, Dr. Devarajan was "worried about [the Plaintiff] becoming stressed with additional work, and that such onset of stress will diminish the quality of [her] work." (Id.)  Dr. Devarajan also allegedly expressed concern that authorizing the Plaintiff to work

additional hours would render Dr. Devarajan "unable to balance the Budget for Pediatrics/NICU." (Id. at 22.)

In her August 25, 2011 email, the Plaintiff also wrote that there are "five moonlighters working regularly in the NICU": (i) "3 Indians – Drs. Souza, Shah, & Srinivasan"; (ii) "1 Russian – Dr. Dolmain"; and (iii) "1 Filipino – Dr. Pakdi." (Id. at 21–22.) The Plaintiff further wrote:

> Dr. Deverajan acknowledged the fact that I am as or probably more clinically competent than my peers. I have superior procedural skills (intubations, placement of central lines), and I'm more knowledgeable about the babies and parents than our moonlighters. At this point, the only reasonable conclusion that I can make is that I am being denied these moonlighting hours because I AM BLACK.

(Id. at 22.)

She further noted:

> [t]his is not the only occasion [Dr. Devarajan] has discriminated against me. Amongst other tactics, she once had the bed in my office removed with no just cause. Of note is the fact that Dr. Dejhalla's bed was left intact in her office. That situation was resolved by Dr. Reilly.

(Id. at 22.)

However, ultimately, according to the SAC, the Plaintiff's bed was returned to her office after she complained to the MMC administration. (SAC at ¶ 72.)

## C. The Alleged Denial of Vacation Time

The Plaintiff also alleges that Dr. Devarajan sought to improperly "prevent [the Plaintiff] from using her hard earned vacation time, culminating in her constant loss of benefit time." (Id. at ¶ 23.) According to the SAC, "in 2010, [Dr. Devarajan] denied [the Plaintiff's] vacation request despite a 7 month notice, only to turn around and approve another neonatologist, Dr. Dejhalla's vacation request made with less than 2 [sic] month's notice." (Id.) Allegedly, "[n]o one else in the . . . NICU had problems with getting vacation time approved by Dr. Dejhalla even with a much shorter notice. Dr. Dejhalla and more recently Dr. Rayjada (hired in 2011) never had any problems with having vacation days approved." (Id. at ¶ 25.)

In July 2012, Dr. Devarajan again "denied [the Plaintiff's] earlier request for vacation days to visit her son in China." (Id. at ¶ 28.)

In August 2012, Dr. Devarajan denied the Plaintiff's third request to use her vacation time "to be with her daughter who was expecting a baby and was having health problems." (Id. at ¶ 29.) According to the SAC, the Plaintiff informed Allison Cianciotto ("Cianciotto"), Vice President of Human Resources at MMC, that Dr. Devarajan's "refusal to allow her to use her accumulated vacation/benefit time was a discriminatory action against her intended to force her to leave her Employment with the Defendants and that this conduct was continuing against her unchecked because of her Race[.]" (Id.)

On August 23, 2012, the Plaintiff allegedly made a "verbal threat to retain an Attorney." (Id. at ¶ 30.) Subsequently on August 24, 2012, the Plaintiff had a meeting with Cianciatto, Dr. Reilly, and Dr. Rosemary Povinelli. (Id.) At the meeting, Dr. Reilly allegedly informed the Plaintiff that "there was an Anonymous Complaint against her alleging that she does not wash her hands before handling patients and did not know how to manage ventilators." (Id.)

In addition, the Plaintiff attaches to the SAC a September 25, 2012 email from Cianciotto to the Plaintiff stating:

> As discussed, due to staffing concerns in your department for the period of time you requested off in December, your vacation cannot be granted. As you are aware, Dr. Rayjada is due on December 20th and could possibly be put out earlier. Unfortunately, you are in a [department] of 3, including the Chairwoman. Patient safety must be our first priority. Thank you.

(SAC, Ex. 7A, Dkt. No. 22–13, at 3.)

In November 2012, the Plaintiff engaged Joel Greenberg, Esq. ("Greenberg") to "assist her in persuading the Defendants to allow her [to] use her vacation time and also ensure that she g[ot] moonlighting hours." (SAC at ¶ 32.)

Subsequently, on December 27, 2012, Dr. Reilly, Dr. Devarajan, and Dr. Povinelli met with the Plaintiff to inform her of their decision to place her on "Focused Practitioner Performance Review"

("FPPR") for three months in light of concerns they had with her management of three patients in the NICU in 2009, 2011, and 2012. (Id. at ¶ 33; see also SAC, Ex. 8F, Dkt. No. 22–13, at 24–25.) The SAC describes FPPR as a probationary period during which a doctor is "expected to work under close supervision and is subject to frequent evaluation." (SAC at ¶ 58.) The Plaintiff alleges that MMC's decision to place her on FFPR was in retaliation for retaining Greenberg. (SAC at ¶ 37.)

Ultimately, the Plaintiff was able to take a vacation in February 2013. (Id. at ¶ 36.)

**D. The Plaintiff's Demotion**

On May 8, 2013, Dr. Devarajan sent the Plaintiff a letter indicating that MMC had decided to extend the Plaintiff's FPPR period for an additional three months "due to low volume in the NICU." (SAC, Ex. 10B, Dkt. No. 22-14, at 4.) The letter informed the Plaintiff that "[d]uring this time, [her] clinical performance will be concurrently reviewed and evaluated by the Department Director. Particular attention will be paid to ventilator and medication management along with adherence to NICU policies." (Id.)

On June 20, 2013, the Plaintiff alleges that unspecified individuals in MMC tampered with the locks to her office. (SAC at ¶ 70.) After notifying "security" at the hospital, security staff members "came and helped replace the padlock." (SAC at ¶ 70.)

In July 2013, Dr. Devarajan conducted a Neonatal Resuscitation Program ("NRP") Recertification class. (Id. at ¶ 48.) Allegedly, Dr. Devarajan invited every physician in the department except for the Plaintiff. (Id.)

On December 2, 2013, the Plaintiff alleges that "someone acting on behalf of the Defendants hacked into [her] CHSLI . . . email account" and sent an "email" from her account. (Id. at ¶ 67.)

On December 6, 2013, Dr. Devarajan sent the Plaintiff another letter informing her that MMC was extending the FPPR period for an additional three months because the Plaintiff had demonstrated "a lack of professionalism, a lack of respect for the Director and a failure to adhere to departmental guidelines for patient management." (SAC, Ex. 10D, Dkt. No. 22–14, at 7.)

On December 15, 2013, the Plaintiff alleges that an unidentified individual, acting on behalf of the Defendants, temporarily changed her status in the "EPIC Electronic Health Record System in the NICU" from a Doctor to a Nurse." (SAC at ¶ 62.)

On December 21, 2013, Dr. Aaron E. Glatt ("Glatt"), an Executive Vice President and Chief Administrative Officer at MMC, sent the Plaintiff a letter notifying her that the hospital had approved her application to be reappointed as a member of the Medical Staff at MMC. (SAC, Ex. 10F, Dkt. No. 22–14, at 8.)

On December 27, 2013, the Plaintiff had a meeting with Dr. Devarajan. (SAC at ¶ 46.) During the meeting, Dr. Devarajan notified the Plaintiff that MMC had decided to demote her by stripping her of her title as Assistant Director of Neonatalogy. (SAC at ¶ 46.) Dr. Devarajan also gave the Plaintiff a letter, dated December 19, 2013, which outlined the reasons for her demotion, including: (i) on December 3, 2013, the Plaintiff was not "receptive" to Dr. Devarajan's orders regarding a newborn's healthcare management; (ii) the Plaintiff "improperly advise[d]" a baby's parents that "their infant was improving and that no further treatment was needed," which resulted "in the confusion for the parents and fostered a serious lack of trust in the care provided at MMC"; (iii) the Plaintiff failed to maintain instructor status through the NRP; (iv) on November 5, 2013, Dr. Devarajan "verbally counselled [the Plaintiff] regarding remarks [she] made to a nurse"; (v) on November 20, 2013, the Plaintiff failed to attend a peer review meeting to discuss two of her cases; and (vi) the Plaintiff failed to alert Dr. Devarajan of an issue with logging onto MMC's Internet platform before reaching out to the Chief Administrative Officer of MMC. (See SAC, Ex. 10I, Dkt. No. 22–14, at 16.)

In a January 23, 2014 letter to the Plaintiff, Dr. Reilly stated, "The administrative team supports the decision and actions taken by Dr. Devarajan based on your insubordinate and unprofessional behavior outlined in the letter given to you on Friday, December 27, 2013." (SAC, Ex. 10J, at 18.) In addition, the letter stated that MMC was extending the FPPR probationary period for another three

months because "there have not been a sufficient number of cases to conclude the evaluation at this time." (Id.)

Also on January 23, 2014, Dr. Reilly and Ira Roeper ("Roeper") met with the Plaintiff to discuss her demotion. (SAC at ¶ 51.) At the meeting, Dr. Reilly allegedly "made false statements claiming that [the Plaintiff] was an incompetent [p]hysician, even though he very well knew that the statements were untrue and published the same to Mr. Ira Roeper." (Id.)

**E. The Plaintiff's Termination**

On February 22, 2014, the Plaintiff filed a charge with the United State Equal Employment Opportunity Commission ("EEOC") under Title VII for alleged discrimination on the basis of race, color, and retaliation. (Gegwich Decl., Ex. B; see also SAC at ¶ 10.)

Subsequently, on an unspecified date, the Plaintiff's office was allegedly "ransacked." According to the SAC, "her books and belongings were strewn all across the floor" and her "shelves were broken." (Id. at ¶ 60.)

On August 21, 2014, MMC terminated the Plaintiff's employment. (Id. at ¶ 4.)

On August 29, 2014, the Plaintiff filed an amended charge with the EEOC, which added CHSIL as a Defendant. (Gegwich Decl., Ex. C; see also SAC at ¶ 10.)

On February 19, 2015, at the request of the Plaintiff, the EEOC issued to the Plaintiff a Notice of Right to Sue. (SAC, Ex. 22, Dkt. No. 22–18.)

**F. The Procedural History**

On April 20, 2015, the Plaintiff commenced this action against the Defendants, asserting causes of action for (i) national origin and race discrimination pursuant to 42 U.S.C. § 1981, Title VII, and NYSHRL § 296(1); (ii) retaliation under Title VII; (iii) violation of the FMLA; and (iv) "libel, slander, and intentional infliction of emotional distress."

The complaint contained sixteen pages of allegations regarding what the Plaintiff described as "significant quality of care issues at Mercy Medical Center." (See Compl. at ¶ 74.) Specifically, the

complaint alleges failures by Dr. Devarajan in treating newborn patients.  (See id. at ¶¶ 74–118.)  In addition, the Plaintiff attached to the complaint two-hundred and eighty-five pages of documents, some of which include partially redacted patient records allegedly substantiating her allegations as to the quality of care issues at Mercy Medical Center.  Although the Plaintiff made some redactions to these documents, many of the documents contain unredacted patient names, patient telephone numbers and addresses, medical record numbers, treatment dates, and details concerning patients' medical care.

On May 15, 2015, the Plaintiff filed an amended complaint ("FAC") in which she added allegations but asserted the same claims against the same Defendants.  The FAC included identical allegations with respect to the "quality of care issues at Mercy Medical Center."  (See FAC at ¶¶ 74–118.)  The Plaintiff also re-attached to the FAC partially redacted patient records.

On May 27, 2015, Christopher G. Gegwich, Esq. ("Gegwich"), an attorney for the Defendants, sent a letter to Ike Agwuegbo, Esq. ("Agwuegbo"), counsel for the Plaintiff, notifying Agwuegbo that the Plaintiff's pleadings and the documents attached to those pleadings contained information which is protected from unrestricted access by the Health Insurance Portability and Accountability Act of 1996, PL 104–191, August 21, 1996, 110 Stat 1936 ("HIPAA"), and Fed. R. Civ. P. 5.2(a).  To deal with this issue, Gegwich proposed "filing redacted versions of the pleadings and exhibits in conformance with HIPAA's disclosure rule[.]"

Agwuegbo did not respond to Gegwich's May 27, 2015 letter. (Gegwich Decl., Ex. B.)

On June 2, 2015, Tony Dulgerian, Esq. ("Dulgerian"), apparently in an effort to avoid unnecessary motion practice, left a voicemail with Agwuegbo and sent him an email asking him to respond to the issues raised by Gegwich in the May 27, 2015 letter.

Later the same day, Agwuegbo sent an email to Dulgerian and Gegwich in which he stated, "I'm sorry I missed your call, I cannot agree to your proposed redaction stipulation. Your firm would have to bring a motion before the Court."  (Gegwich Decl., Ex. B.)

Subsequently, on the same day, Dulgerian again reached out to Agwuegbo by phone and email to meet and confer regarding the Defendants' redaction proposal.  (See id.)

Later on June 2, 2015, Agwuegbo sent an email to Dulgerian and Gegwich, in which he stated:

> We have redacted all HIPAA protected information contained in the Complaint and Exhibits. The majority of redactions your Firm seeks, we believe are not HIPAA protected. We also believe the Court should make that determination thus preserving our futuristic options.

(Id.)

On June 16, 2015, the Defendants filed a motion pursuant to Fed. R. Civ. P. 5.2(f) and 26(c)(1)(H) to (i) seal the complaint, the amended complaint, and exhibits to those documents; and (ii) direct the Clerk of the Court or the Plaintiff to file redacted versions of the Complaint, the amended complaint, and their exhibits in a redacted form proposed by the Defendants.

On June 17, 2015, the Defendants filed a motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the amended complaint in its entirety.

On June 29, 2015, the Plaintiff filed a cross-motion to amend her complaint pursuant to Fed. R. Civ. P. 15(a)(2).  In connection with her motion, the Plaintiff attached a proposed SAC, which left the allegations in her prior amended complaint largely intact and also sought to add two claims for (i) violation of Due Process under the Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101 et seq. ("HCQIA"); and (ii) a hostile work environment under Title VII.

In addition, the Plaintiff attached to her motion an additional 648 pages of documents as exhibits to the SAC.  Not only did the Plaintiff re-attach the partially redacted patient documents filed with her previous two complaints, but she also attached a copy of her rebuttal statement to the EEOC and its exhibits, which contain full patient names, full medical records, partial dates of birth of infant patient, MMC's tax identification number, and other personal identifying information of MMC's patients.

Further, on July 20, 2015, the Plaintiff filed an opposition memorandum to the Defendants' motion to seal in which she attached 731 pages of documents, which included additional categories of partially redacted medical records of her patients.

Presently before the Court is (i) a motion by the Defendants to dismiss the amended complaint; (ii) a cross-motion by the Plaintiff to file a second amended complaint; and (iii) a motion by the Defendants to seal the complaint, amended complaint, and exhibits attached thereto.

The Court will now address each motion.

## II. DISCUSSION

**A. As to the Sufficiency of the Plaintiffs' Claims**

The SAC asserts the following causes of action against the Defendants: (i) national origin and race discrimination claims pursuant to 42 U.S.C. § 1981, Title VII, and NYSHRL § 296(1); (ii) a hostile work environment under Title VII; (iii) a retaliation claim under Title VII; (iv) an FMLA interference claim; (v) a Due Process claim under the HCQIA; and (vi) a claim for "libel, slander, and intentional infliction of emotional distress."

Below, the Court will address the applicable legal standards and the sufficiency of each cause of action.

### 1. The Legal Standards

#### a. Rule 8

As an initial matter, the Court notes that the Plaintiff's amended complaint and proposed SAC border on violating Fed. R. Civ. P. 8(a)(2). The rule states, "[A] claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief[.]" The Second Circuit has explained:

> The statement should be plain because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial . . . . The statement should be short because '[u]nnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage.'

Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (quoting 5 C. Wright & A. Miller, <u>Federal</u> <u>Practice and Procedure</u> § 1281, at 365 (1969)).

Of importance, "when a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative or in response to a motion by the defendant, to strike any portions that are redundant or immaterial . . . or to dismiss the complaint." <u>Id.</u> However, "[d]ismissal pursuant to the rule 'is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.'" <u>Wynder v. McMahon</u>, 360 F.3d 73, 80 (2d Cir. 2004) (quoting <u>Salahuddin</u>, 861 F.2d at 42).

For example, a district court dismissed a complaint pursuant to Rule 8 because it was "disjointed and unorganized, and literally hundreds of paragraphs are irrelevant (or relevant only to claims that have already been dismissed with prejudice), repetitive, and/or contradictory." <u>Grimes v.</u> <u>Fremont Gen. Corp.</u>, 933 F. Supp. 2d 584, 596 (S.D.N.Y. 2013); <u>see also</u> <u>Blakely v. Wells</u>, 209 F. App'x 18, 20 (2d Cir. 2006) (Summary Order) ("The District Court acted within the bounds of permissible discretion in dismissing the second amended complaint for noncompliance with Rule 8(a). The pleading, which spanned 57 pages and contained 597 numbered paragraphs, was far from short or plain. Moreover, as the District Court correctly observed, much of the complaint was incoherent and did not provide Defendants with fair notice of the claims asserted against them.").

By contrast, in <u>Wynder</u>, *supra*, the Second Circuit found that although the plaintiff's submission was "a model of neither clarity nor brevity," his "long submission d[id] not overwhelm the defendants' ability to understand or to mount a defense." 360 F.3d at 79–80. Accordingly, the Circuit Court found that the complaint passed Rule 8 muster and vacated the district court's dismissal order. <u>Id.</u> at 80. However, it noted that on remand, the district court could exercise its discretion to "strike redundant or immaterial matter, leaving the facially valid claims to be litigated." <u>Id.</u>

In the present case, the Plaintiff, represented by counsel, filed a complaint, the FAC, and a proposed SAC, each of which exceeds fifty-seven pages and contains at least sixteen pages of identical allegations relating to the "significant quality of care issues at Mercy Medical Center." The Plaintiff does not assert negligence claims for which MMC's duty of care may be relevant. Rather, her claims are primarily focused on her employment and the Defendants' alleged discriminatory acts related to her race and national origin. Therefore, the Court finds that the supposed "quality of care issues at MMC" are not relevant to the Plaintiff's claims and appear to be included for the sole purpose of attacking the reputation of the Defendants.

In addition, the pleadings appear to be a confused mixture of allegations that are not in chronological order or tied together in any kind of coherent fashion. Adding to the confusion, the Plaintiff attached 285 pages of documents to her complaint and FAC, and 648 pages of documents to the proposed SAC, which are not labelled or organized in a way that is easily accessible.

For these reasons, the Court finds that the Plaintiff's amended complaint and proposed SAC do not contain "short or plain statements" of her claims for purposes of Rule 8. However, despite the burden placed on the Court by her pleadings, the Court is able to discern the Plaintiff's theories of liability and therefore, in an abundance of caution, the Court declines to *sua sponte* dismiss the amended complaint and proposed SAC on the sole basis of Rule 8.

However, in its discretion, the Court strikes allegations 74 to 118 of the complaint, the FAC and the proposed SAC regarding the alleged "quality of case issues" at MMC because the Court finds that they are not relevant to this action and are highly prejudicial to the Defendants. See Fed. R. Civ. P. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."); see also Foreman v. Comm. Goord, No. 02 CIV. 7089 (SAS), 2004 WL 385114, at *4 (S.D.N.Y. Mar. 2, 2004) ("When a complaint does not comply with Rule 8, the court may dismiss the complaint or strike those portions that are redundant or immaterial.").

The Court will now turn to the legal standards applicable to the Defendants' motion to dismiss and the Plaintiff's cross-motion to amend.

### b. The Motion to Dismiss

In considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court generally "'accept[s] all allegations in the complaint as true and draw all inferences in the non-moving party's favor.'" LaFaro v. New York Cardiothoracic Grp., PLLC, 570 F.3d 471, 475 (2d Cir. 2009) (quoting Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir. 2003)). However, a complaint must plead "enough facts to state a claim to relief that is plausible on its face" to survive a 12(b)(6) motion to dismiss. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). In particular, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." Id.; see also Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) ("[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (citation omitted); Luna v. N. Babylon Teacher's Org., 11 F. Supp. 3d 396, 401 (E.D.N.Y. Apr. 7, 2014) ("Conclusory allegations of legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss.") (citing Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006)).

In considering a motion to dismiss, a court is generally "limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007) (citing Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002)).

In the present case, as noted above, the Plaintiff attached 648 pages of documents as exhibits to the proposed SAC. The Court has taken considerable pains to review these voluminous papers and finds that at least some of the exhibits, such as the EEOC charge and various emails regarding the

Plaintiff's disciplinary history, are referenced in and relevant to the Plaintiff's claims. Thus, the Court has considered these exhibits for purposes of this motion.

However, other documents attached to the SAC, including unredacted or partially redacted patient records, have no bearing on the sufficiency of the Plaintiff's discrimination claims. The Court will discuss these documents in more detail in the context of the Defendants' motions to seal. However, for purposes of the Defendants' Rule 12(b)(6) motion, the Court does not consider these extraneous patient records because they are not relevant to the issues at hand. See Jacob's Vill. Farm Corp. v. Yusifov, No. 14 CV 4109 (PKC), 2015 WL 5693706, at *4 (E.D.N.Y. Sept. 28, 2015) ("Attached to Defendants' motion to dismiss are documents extrinsic to the Complaint. (See Dkts. 14–4, 14–5.) Though the protective orders at issue are matters of public record, for which the Court may take judicial notice, the Court does not consider them because they are irrelevant to Plaintiffs' PACA claims. The Court likewise does not consider Jacob's affidavit responding to Defendants' exhibits because it is also irrelevant to the issues raised by Defendants' motion."); cf. Wendell v. New York State Ins. Dep't, No. 04-CV-2889 DRH/ETB, 2007 WL 2455132, at *6 (E.D.N.Y. Aug. 23, 2007) ("Plaintiff is advised that his proclivity to annex lengthy attachments to his pleadings, which are both unnecessary and irrelevant to the issues at hand, serve no purpose other than to distract from his real claims and should not be included in any further pleading.").

### c. The Motion to Amend

Where, as here, a party has already amended his or her pleadings once, Fed. R. Civ. P. 15(a)(2) governs the propriety of further amendments. The Rule states, "[A] party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."

The Second Circuit has interpreted Rule 15(a)(2) to mean that "[l]eave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'"

TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 505 (2d Cir.2014) (quoting McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir.2007)).

A proposed new pleading is futile when it "fails to state a claim on which relief can be granted." Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012). Thus, "[a]n amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir. 2002) (citing Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)).

In the present case, the Plaintiff cross-moved to amend the FAC while the Defendants' motion to dismiss the FAC was still pending. In such a circumstance, "the Court has 'a variety of ways in which it may deal with the pending motion to dismiss, from denying the motion to dismiss as moot to considering the merits of the motion in light of the amended complaint.'" MB v. Islip Sch. Dist., No. 14-CV-4670 (SJF) (GRB), 2015 WL 3756875, at *4 (E.D.N.Y. June 16, 2015) (quoting Schwartzco Enters. LLC v. TMH Mgmt., LLC, No. 14–CV–1082 (ADS) (GRB), 2014 WL 6390299, at *1 (E.D.N.Y. Nov.17, 2014) (Spatt, J)).

Where, as here, the plaintiff does not seek to add new defendants and the presently named defendants have the opportunity to respond to the proposed amended complaint, courts in this Circuit have considered "the merits of the motion to dismiss . . . in light of the proposed amended complaint." Haag v. MVP Health Care, 866 F. Supp. 2d 137, 140 (N.D.N.Y.2012); see also MB, 2015 WL 3756875 at *4 (same); Costello v. Town of Huntington, No. 14-CV-2061 (JS) (GRB), 2015 WL 1396448, at *1 (E.D.N.Y. Mar. 25, 2015) ("Because the proposed Amended Complaint has not added any additional parties, (see Am. Compl., Docket Entry 11–2, at ¶¶ 9–11), and because Defendant has had an opportunity to respond to the proposed Amended Complaint, the Court will consider the merits of Defendant's motion in light of the allegations in the proposed Amended Complaint.").

Thus, the Court will consider the merits of the Defendants' motion to dismiss in light of the Plaintiff's proposed SAC.

### 2. As to the Race and National Origin Discrimination Claims

In Counts 1, 2, 3, 5, and 6 of the SAC, the Plaintiff alleges that the Defendants subjected her to discrimination on the basis of her race (African American) and her national origin (Nigerian) in violation of Section 1981, Title VII, and NYSHRL § 296.

The Defendants assert that these discrimination claims fail as a matter of law because (i) the Plaintiff cannot assert Title VII or NYSHRL claims against the Individual Defendants Drs. Devarajan and Reilly; (ii) most of the Plaintiff's claims under Title VII are time-barred; (iii) the Plaintiff failed to administratively exhaust her remedies with respect to her Title VII national origin claims; and (iv) even if true, the Plaintiff's allegations fail to state plausible race or national origin discrimination claims. (The Defs.' Mem. of Law, Dkt. No. 21, at 11–20.)

In response, the Plaintiff (i) fails to address the Defendants' arguments with respect to the individual Defendants and administrative exhaustion; (ii) asserts somewhat perplexingly that her Section 1981 claim is plausible by quoting from the language of 42 U.S.C. § 1983, a different statute and claim; (iii) asserts that her Title VII claims are not time-barred under the "continuing violation" doctrine; and (iv) asserts that she stated plausible claims for race and national origin discrimination. (The Pl.'s Mem. of Law, Dkt. No. 25, at 10–16.)

The Court agrees that even if true, the allegations in the SAC fail to state a plausible claim of race or national origin discrimination. Therefore, the Court need not reach the issues of individual liability, timeliness, and exhaustion.

As noted above, the SAC asserts discrimination claims under two federal statutes — Title VII and Section 1981 — and one state statute — the NYSHRL. The same framework and pleading standard governs all three statutes. See Awad v. City of New York, No. 13 CIV. 5753 BMC, 2014 WL 1814114, at *5 (E.D.N.Y. May 7, 2014) ("Discrimination claims under § 1981, § 1983, and NYSHRL are analyzed under the same framework and pleading standard as Title VII claims."); see also Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) ("The identical standards apply to

employment discrimination claims brought under Title VII, Title IX, New York Executive Law § 296, and the Administrative Code of the City of New York."); Ruiz v. Cty. of Rockland, 609 F.3d 486, 491 (2d Cir. 2010) (noting that the plaintiff's "Title VII claims and his claims for race and national origin discrimination under Sections 1981 and 1983" are analyzed under the same framework). Accordingly, the Court considers the claims together in determining the sufficiency of the Plaintiff's allegations.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

To state a claim for employment discrimination under Title VII, "a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 87 (2d Cir. 2015).

As to the first element, "[a] plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." Id. (alteration added) (quoting Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)). Importantly, "[a]n 'adverse employment action' is one which is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (quoting Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)). "Examples of materially adverse changes include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Id. (quoting Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)).

With regard to the second element, "[a]t the pleadings stage, . . . a plaintiff must allege that the employer took adverse action against her at least in part for a discriminatory reason, and she may do so

by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." Vega, 801 F.3d at 87. "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" Littlejohn v. City of New York, 795 F.3d 297, 312 (2d Cir. 2015) (quoting Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009)).

Here, the Plaintiff alleges a number of allegedly discriminatory actions on the part of the Defendants, including: (i) Dr. Devarajan, her direct supervisor, denied the Plaintiff's requests for additional "moonlighting" hours, see SAC at ¶¶ 20–22; (ii) in 2010, Dr. Devarajan ordered a bed removed from the Plaintiff's office, see id. at ¶ 71; (iii) in 2011 and 2012, Dr. Devarajan denied the Plaintiff's requests for vacation, see id. at ¶¶ 23–29; (iv) beginning on December 27, 2012, the Plaintiff was placed on FPPR — a type of probation in which she was "expected to work under close supervision and is subject to frequent evaluation," see id. at ¶¶ 33, 58; (v) in June 2013, unspecified employees, acting on the Defendants' behalf, tampered with the locks to the Plaintiff's office, see id. at ¶ 70; (vi) in July 2013, Dr. Devarajan did not invite the Plaintiff to an NRP Recertification class, see id. at ¶ 48; (vii) in December 2013, unidentified employees hacked into the Plaintiff's computer and changed her status in MMC's online network from doctor to nurse, see id. at ¶¶ 62, 67; (viii) on December 27, 2013, Dr. Devarajan stripped the Plaintiff of her title as Assistant Director of Neonatology, see id. at ¶ 58; (ix) in February 2014, unidentified employees, also acting on the Defendants' behalf, threw the books in the Plaintiff's office on the floor and broke her shelves, see id. at ¶ 61; and (x) on August 21, 2014, MMC terminated the Plaintiff's employment, see id. at ¶ 4.

The Court finds that five of these alleged incidents — namely, removing the Plaintiff's bed from her office, tampering with the lock and papers in her office, failing to invite her to a training class, and interfering with her access to the MMC computer network — were isolated incidents, which

took place over a number of years and resulted in temporary disruptions to the Plaintiff's work day. Thus, even if true, these incidents represent at most inconveniences and cannot plausibly be construed as "adverse actions" which materially changed the terms and conditions of the Plaintiff's employment at MMC. See Vega, 801 F.3d at 85 ("'An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities.'") (Terry, 336 F.3d at 138); see also Sank v. City Univ. of New York, No. 10 CIV. 4975 (RWS), 2011 WL 5120668, at *9 (S.D.N.Y. Oct. 28, 2011) ("Although Plaintiff contends that the terms and conditions of her employment were changed because the reallocated storage space had been used by Sank for research, scholarly, and teaching activities, the Complaint does not contain a single allegation that Sank suffered any diminution in title, seniority, salary or other tangible benefits as a consequence of this decision.").

There are five remaining incidents of alleged discrimination — namely, (i) Dr. Devarajan denied the Plaintiff's request for additional "moonlighting" hours from 2006 to 2011; (ii) in 2011, Dr. Devarajan denied the Plaintiff's requests for vacation on three separate occasions; (iii) beginning on December 27, 2012, Dr. Devarajan placed the Plaintiff on FPPR probation for successive three month periods until her employment was terminated on August 21, 2014; (iv) on December 27, 2013, Dr. Devarajan stripped the Plaintiff of her Assistant Director title; and (v) on August 21, 2014, MMC terminated her employment.

Even assuming that each of these incidents constitutes an adverse employment action, there are no allegations from which a jury could plausibly infer that the Defendants were at least in part motivated by the fact that the Plaintiff is African American or that she was born in Nigeria. In this regard, the Court will address each incident, in turn.

First, the Plaintiff alleges that the Dr. Devarajan treated "external moonlighters (most predominantly of Indian Descent)" more favorably than her in assigning "moonlighting" hours, as in overtime hours on nights and weekends. (SAC at ¶ 22.)

An inference of discrimination can arise from allegations showing "more favorable treatment of employees not in the protected group," also referred to as "disparate treatment." Littlejohn, 795 F.3d at 312 (internal quotation mark and citation omitted). "A plaintiff relying on disparate treatment evidence 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" Mandell v. Cty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003). To be similarly situated in "all material respects," "a plaintiff must show that her co-employees were subject to the same performance evaluation and discipline standards." Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000).

Although the question of whether an employee is similarly situated to the plaintiff is generally a question of fact for the jury to decide, courts in this Circuit have held that the plaintiff must at least plead allegations from which it is plausible to conclude that the comparators are similarly situated. See Weslowski v. Zugibe, 14 F. Supp. 3d 295, 319 (S.D.N.Y. 2014) ("[A]lthough, '[a]t the motion to dismiss stage, . . . evidence [of similarly situated comparators] is not necessary[,] . . . a court still must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated.'") (alteration in original) (quoting Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills, 815 F.Supp.2d 679, 698 (S.D.N.Y. 2011)); see also Horsham v. Fresh Direct, No. 14-CV-651 (MKB), 2015 WL 5692908, at *10 (E.D.N.Y. Sept. 28, 2015) ("Because this is only the pleading stage, and Plaintiff is pro se, there need only be a minimal showing of comparability."); Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills, 815 F. Supp. 2d 679, 698 (S.D.N.Y. 2011) ("At the motion to dismiss stage, such evidence is not necessary; however, a court still must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated.").

For example, in the motion to dismiss context, a district court dismissed a disparate treatment claim under Title VII where the complaint was "entirely devoid of any details regarding the purported comparators, e.g., who they are, what their positions or responsibilities were at [the company], how

their conduct compared to plaintiffs' or how they were treated differently by defendants." Haggood v. Rubin & Rothman, LLC, No. 14-CV-34L (SJF) (AKT), 2014 WL 6473527, at *12 (E.D.N.Y. Nov. 17, 2014); see also Henry v. NYC Health & Hosp. Corp., 18 F. Supp. 3d 396, 409 (S.D.N.Y. 2014) (dismissing a disparate treatment claim, in part, because "the Amended Complaint does not allege that any similarly situated male employee received more favorable treatment than Henry — the Amended Complaint fails to identify, let alone describe, any purported comparator"); Kajoshaj v. City of New York, No. 11-CV-4780 (FB) (JMA), 2013 WL 249408, at *2 (E.D.N.Y. Jan. 23, 2013) aff'd sub nom., 543 F. App'x 11 (2d Cir. 2013) ("[W]ithout specific factual allegations concerning these allegedly similarly situated individuals, such a bare conclusion cannot survive a motion to dismiss.").

In the present case, the SAC provides no information on the "external Moonlighters" other than stating that they are of Indian descent. Importantly, the SAC does not contain allegations concerning the "external Moonlighters" positions or titles, nor how many hours they were assigned. Such a bare allegation is far too vague and bereft of specifics to plausibly allege a claim of disparate treatment on the part of the Defendants in assigning moonlighting hours. See Mesias v. Cravath, Swaine & Moore LLP, 106 F. Supp. 3d 431, 437 (S.D.N.Y. 2015) ("The allegation that a non-Haitian employee could 'borrow' vacation days, while Plaintiff could not, also fails to render plausible an inference of discrimination. The Complaint alleges no facts demonstrating that Plaintiff was 'similarly situated' to her non-Haitian colleague."); Almontaser v. New York City Dep't of Educ., No. 13 CV 5621 (ILG) (VMS), 2014 WL 3110019, at *7 (E.D.N.Y. July 8, 2014) ("Nor can plaintiff establish an inference of discrimination through allegations of disparate treatment. He does not identify a similarly-situated comparator who was treated more favorably but alleges only that older, non-Caucasian teachers were treated poorly."); Thompson v. New York City, No. 12 CIV. 8034 (PAE), 2013 WL 6409326, at *8 (S.D.N.Y. Dec. 9, 2013) ("The spare allegations in the SAC supply no nonspeculative basis to conclude that defendants treated Thompson and Sentino differently based on race.").

Second, the Plaintiff asserts that she has sufficiently pled a disparate treatment claim based on allegations that she "would sometimes give notice of intention to take a vacation several months in advance, yet Dr. Devarajan w[ould] claim that she could not find coverage[.]" (The Pl.'s Opp'n Mem. of Law, Dkt. No. 25, at 18–19.) She also asserts that on one occasion, Dr. Devarajan "denied [her] vacation request despite a 7 month notice, only to turn around within a few days and approve Dr. Dejhalla's (Another Neonatologist employed by [MMC] at the time) vacation request made with less than two months notice." (Id. at 19.)

Again, the allegations in the SAC fall well short of giving rise to an inference that Dr. Devarajan's decision to deny the Plaintiff's requests for vacation was motivated in part by discrimination. There are no allegations that Dr. Devarajan made any explicit and implicit discriminatory comments in connection with the Plaintiff's requests for vacation. Further, even if true, the allegation that Dr. Devarajan treated Dr. Dejhalla more favorably than the Plaintiff in granting her vacation request does not plausibly suggest discrimination because the Plaintiff fails to plead facts from which a jury could conclude that (i) Dr. Dejhalla was of a different race and ethnicity than the Plaintiff; and (ii) was similarly situated to the Plaintiff in all other respects. Thus, here too, the Court finds that the Plaintiff's allegations of discriminatory treatment amount to little more than speculation.

Third, the Plaintiff asserts that the decisions by Dr. Devarajan and Dr. Reilly to place her on FPPR probation, to strip of her of her title as Assistant Director of Neonatology at MMC, and to terminate her employment were motivated at least in part by discrimination. (See SAC at ¶¶ 147–152, 160–165.)

Again, the SAC does not allege circumstances which plausibly give rise to an inference of discrimination, such as the Defendants' "criticism of the plaintiff's performance in ethnically degrading terms"; "invidious comments" about African American or individuals of Nigerian descent; "the more favorable treatment" of similarly situated employees not in the Plaintiff's protected group

who had a similar disciplinary history; or a suggestive sequence of events leading to the Plaintiff's demotion and subsequent termination.  See Littlejohn, 795 F.3d at 312.

Instead, the Plaintiff relies solely on conclusory allegations that the Defendants acted with a discriminatory motive, without providing any allegations from which a jury could plausibly make such a conclusion.   These naked assertions fall well short of pleading a plausible discrimination claim.  See, e.g., Soloviev v. Goldstein, 104 F. Supp. 3d 232, 249 (E.D.N.Y. 2015) ('"[N]aked assertions of discrimination without any specific factual allegation of a causal link between the defendants' conduct and the plaintiff's protected characteristic are too conclusory to withstand a motion to dismiss."') (quoting Doe v. Columbia Univ., 14–CV–3573 (JMF), 2015 WL 1840402, at *7 (S.D.N.Y. Apr. 21, 2015)); Campbell v. New York City Transit Auth., 93 F. Supp. 3d 148, 173 (E.D.N.Y. 2015) ('"In the absence of any circumstantial evidence of discriminatory animus other than the differential treatment, the inference that the difference in treatment is attributable in part to discrimination would be based on speculation rather than on evidence or a rational inference."') (quoting Setelius v. Nat'l Grid Elec. Servs. LLC, No. 11–CV–5528, 2014 WL 4773975, at *18 (E.D.N.Y. Sept. 24, 2014)); DeLaurencio v. Brooklyn Children's Ctr., Superintendent, 111 F. Supp. 3d 239, 249 (E.D.N.Y. 2015) (granting a motion to dismiss a Title VII gender discrimination claims because "[t]he facts do not suggest that Inganamort's facially-neutral, albeit rude, conduct was motivated by discriminatory animus. Although it is not dispositive that all of these incidents are facially neutral, there is simply no *factual* basis for inferring discriminatory animus") (emphasis in original).

Indeed, the December 19, 2013 letter from Dr. Devarajan to the Plaintiff explaining her decision to place the Plaintiff on FPPR probation and to take away her title of Assistant Director of Neonatology indicate that the Plaintiff had a long disciplinary history, which included reports of insubordination; mismanaging newborn patients and their parents; making improper remarks to colleagues; and failing to follow office protocol in treating patients.  (See SAC, Ex. 8F, Dkt. No. 22–13, at 24–25.)  While the Plaintiff may disagree with the clearly non-discriminatory reasons offered by

Dr. Devarajan for her discipline, the existence of such a disagreement, without more, does not give rise to a cognizable discrimination claim under Title VII. See Howard v. City of New York, 602 F. App'x 545, 548 (2d Cir. 2015) (Summary Order) ("In sum, Howard has done little more than cite to his alleged mistreatment and ask the court to conclude that 'it must have been related to [his] race. This is not sufficient.'") (quoting Lizardo v. Denny's, Inc., 270 F.3d 94, 104 (2d Cir. 2001)); Campbell v. New York City Transit Auth., 93 F. Supp. 3d at 173 ("Plaintiff has done no more than point to various ways in which she feels she was mistreated and argue that it must have been because of her sex, age, or disability. This is not sufficient to sustain a claim of discrimination."). Importantly, the Court's "'role is to prevent unlawful [employment] practices, not to act as a 'super personnel department' that second guesses employers' business judgments.'" Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001) (parenthetically quoting Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1330 (10th Cir. 1999)).

In sum, the SAC contains little more than speculative and conclusory allegations of race and national origin discrimination, which are in many ways directly undermined by the Plaintiff's extensive disciplinary history as evidenced in the litany of documents attached to the SAC. Therefore, the Court finds that the Plaintiff has failed to state a claim for race or national original discrimination and dismisses counts 1, 2, 3, 5 and 6 of the SAC.

### 3. As to the Hostile Work Environment Claims

For many of the same reasons, the Plaintiff's hostile work environment claim also fails as a matter of law.

As noted, Title VII prohibits an employer from discriminating in "compensation, terms, conditions, or privileges of employment, because of [an] individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1).

"'The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment,' which

includes requiring people to work in a discriminatorily hostile or abusive environment." Redd v. New York Div. of Parole, 678 F.3d 166, 175 (2d Cir. 2012) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

"To establish a hostile work environment under Title VII . . . , a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Littlejohn, 795 F.3d at 320-21 (quoting Harris v, 510 U.S. at 21). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014) (quoting Harris, 510 U.S. at 21). To be objectively pervasive, "[t]he incidents complained of 'must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Id. (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)). To be objectively severe, courts consider factors, such as, "the frequency of the discriminatory conduct; . . . whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (quoting Harris, 510 U.S. at 23).

For example, a court found conduct by the plaintiff's supervisors to be sufficiently severe and pervasive based on allegations that the defendant sent graphic emails to the plaintiff regarding his genital pain, circulated the emails among staff and hung them in the mail room, and other individuals frequently "grabb[ed] their testicles" in front of the plaintiff and "ma[d]e comments such as 'good luck making kids with that package,' and winking and laughing at him." Davis v. Vermont, Dep't of Corr., 868 F. Supp. 2d 313, 329 (D. Vt. 2012); see also Zavala v. Cornell Univ., 9 F. Supp. 3d 213, 220 (N.D.N.Y. 2014) ("The Complaint states facts sufficient to proceed on a hostile work environment claim; Plaintiff has alleged that actions taken by Huijts and Butler, including their threats regarding Plaintiff's use of internal human resources mechanisms, unreasonably interfered with Plaintiff's job

performance. With knowledge of Plaintiff's mobility limitations, Defendant took away Plaintiff's vehicle, forcing him to arrange rides with other team members to and from work sites. When Plaintiff requested accommodation to work on less walking-intensive jobs, Butler responded by assigning Plaintiff to tasks that required more walking.").

By contrast, the Second Circuit affirmed a district court's Rule 12(b)(6) dismissal of a hostile work environment claim because the Circuit Court found that the plaintiff put forth evidence of only one racial comment and "her other allegations are generally quite minor — she alleges that defendants wrongly excluded her from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her." Fleming v. MaxMara USA, Inc., 371 F. App'x 115, 119 (2d Cir. 2010) (Summary Order); see also Littlejohn, 795 F.3d at 321 (affirming the dismissal of a hostile work environment claim because it found that the plaintiff's allegations — namely, that the plaintiff's supervisors made "negative statements" about him, took a harsh tone toward him, replaced him at a meeting with another employee, wrongfully reprimanded him, and increased his work load — "could not support a finding of hostile work environment that is so severe or pervasive as to have altered the conditions of Littlejohn's employment.").

Here, the Plaintiff seeks to add a hostile work environment claim to the SAC based on allegations that the Defendants: (i) in 2010, temporarily removed a bed from her office; (iii) in June 2013, tampered with her office keys and locks; (iv) in December 2013, changed her status in MMC's computer system from doctor to nurse; (v) in December 2013, allowed an unidentified employee to hack into her e-mail account and send "spam" messages to other employees; (vi) in February 2014, broke bookshelves in her office and threw "her belongings all over the office floor"; and (vii) in August 2014, terminated her employment. (See SAC ¶¶ 60–69, 70–72, 182.)

The Defendants assert that (i) these allegations even if true, are not objectively severe or pervasive and therefore, fail to state a plausible hostile work environment claim; (ii) the SAC provides

no basis to believe that any of the actions complained of were undertaken by the Defendants; and (iii) the SAC and the documents attached to the SAC show that the Defendants adequately responded to all of the Plaintiff's complaints. (The Defs.' Opp'n Mem. of Law, Dkt. No. 30, at 11–16.)

The Plaintiff does not coherently address any of these arguments by the Defendants and instead merely restates the allegations in the SAC. (See the Pl.'s Reply Mem. of Law, Dkt. No. 31, at 5–8.)

The Court agrees with the Defendants that the Plaintiff does not allege that the Defendants' conduct was severe or pervasive and therefore, there is no need to reach their remaining contentions.

The Plaintiff's hostile work environment claim is premised on seven alleged actions by the Defendants which took place sporadically over a period of four years and appear to have no connection with each other. Furthermore, none of the allegations are explicitly race or ethnically-based, and they are composed of relatively minor and temporary inconveniences — such as, problems with the locks to her office and her computer access, as well as, interference with supplies and furniture in her office — which even if true, do not plausibly suggest that MMC was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the [the Plaintiff's] employment and create an abusive working environment." Littlejohn, 795 F.3d at 320-21 (alteration added) (quoting Harris v, 510 U.S. at 21).

Accordingly, the Court finds that the Plaintiff's proposed amendment adding a hostile work environment claim is futile and denies the Plaintiff's motion to amend with respect to that claim. See Mesias v. Cravath, Swaine & Moore LLP, 106 F. Supp. 3d 431, 439 (S.D.N.Y. 2015) ("Plaintiff alleges that she was subjected to two inappropriate comments regarding her age and gender, that she was unable to 'borrow' vacation days from the following year, that Cravath delayed in awarding her a bonus, and that she was blamed for various mistakes that were not her fault. These allegations do not rise to the level of a hostile work environment."); Raeburn v. Dep't of Hous. Pres. & Dev. of the City of New York, No. 10-CV-4818 (SLT) (MDG), 2015 WL 4016743, at *15 (E.D.N.Y. June 24, 2015) ("[T]he Complaint alleges a few isolated incidents, only some of which were even arguably

discriminatory in nature. Accordingly, the Complaint fails to state hostile work environment claims under Title VII or the ADEA.").

### 4. As to the Retaliation Claims

The Plaintiff's Title VII retaliation claim fares no better than her other Title VII claims. Title VII makes it unlawful "for an employer to discriminate against any . . . employee[ ] . . . because [that individual] opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII investigation or proceeding. 42 U.S.C. § 2000e–3(a). At the summary judgment stage, to make a *prima facie* case for retaliation, a plaintiff must present evidence that shows: "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (quoting Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)). However, at the motion to dismiss stage, a plaintiff need only "plausibly allege that: (1) defendants discriminated — or took an adverse employment action — against him, (2) 'because' he has opposed any unlawful employment practice." Vega, 801 F.3d at 90 (citing 42 U.S.C. § 2000e–3(a)).

"[A]n adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Id. (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57, 126 S. Ct. 2405, 165 L.Ed.2d 345 (2006)). Importantly, "[t]his definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII: '[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'" Id. (quoting Burlington, 548 U.S. at 64).

With regard to the "protected activity" requirement, the Second Circuit recently clarified that a plaintiff can allege that they engaged in "protected activity" in one of two ways. First, the so-called "participation clause" of Title VII defines "protected activity" with reference to "participation in

formal EEOC proceedings" but "'does not include participation in an internal employer investigation unrelated to a formal EEOC charge.'" Littlejohn, 795 F.3d at 316 (quoting Townsend v. Benjamin Enters., Inc., 679 F.3d 41, 48 (2d Cir. 2012)). Second, the so-called "opposition clause" of Title VII broadens "protected activity" to include "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." Id. (quoting Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)). However, such "informal protests" only fall within the purview of Title VII if the employee "possessed a good faith, reasonable belief that the underlying employment practice was unlawful under [Title VII]." Summa v. Hofstra Univ., 708 F.3d 115, 126 (2d Cir. 2013) (quoting Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998)).

Finally, with respect to "causation," a "plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." Vega, 801 F.3d at 90. Under the "but for" causation standard, an employee must plausibly allege that "the adverse action would not have occurred in the absence of the retaliatory motive." Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013). This is a higher causation standard than the causation standard for Title VII discrimination claims, which, as noted early, only requires a plaintiff to plead that discrimination was a "motivating factor" in the employer's decision. See Vega, 801 F.3d at 90–91.

A plaintiff can demonstrate "but for" causation "'(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" Littlejohn, 795 F.3d at 319 (quoting Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).

Here, the Defendants assert that the Plaintiffs' retaliation claim fails because (i) most of the alleged retaliatory acts are time-barred; (ii) the Plaintiff "has not alleged, nor could she, a causal

connection between her protected activity and any adverse employment action"; and (iii) there is no Title VII liability for the individual Defendants in this action. (The Defs.' Mem. of Law, Dkt. No. 21, at 23–25.)

In response, the Plaintiff (i) relies on the continuing violation doctrine as an exception to the Defendants' timeliness argument; (ii) claims that she has stated an adequate retaliation claim, though she does not cite to any legal authority supporting this assertion; and (iii) does not address the issue of individual liability. (The Pl.'s Opp'n Mem. of Law, Dkt. No. 25, at 11–14.)

Again, the Court finds that the allegations in the SAC clearly fail to state a plausible retaliation claim. Therefore, the Court does not reach the issues of timeliness or individual liability.

First, the Plaintiff alleges that she was placed on FPPR probation in December 2012 after she hired Greenberg, her former counsel, to "assist her in getting her vacation approved and securing moonlight hours." (SAC at ¶ 154.)

Although it did not result in a "material change" to the terms of her employment, the Court finds that Dr. Devarajan's decision to place the Plaintiff on FPPR probation constitutes an adverse action for purposes of a retaliation claim because it is the kind of action which could dissuade a reasonable worker from engaging in a protected activity.

However, the fundamental problem with the Plaintiff's claim is that she does not plausibly allege that her efforts to retain Greenberg to obtain vacation days were related to a formal EEOC proceeding or an "informal protest" relating to MMC's alleged discriminatory practices. Rather, the SAC alleges, "In November 2012, [the Plaintiff] . . . had to engage Mr. Joel Greenberg Esq. to assist her in persuading the Defendants to allow her to use her vacation time and also ensure that she gets moonlighting hours in accordance with the prior agreement reached by [the Plaintiff] and Mercy Medical Center during the time of Mr. Martin Bieber." (SAC at ¶ 12.) As alleged, nothing about the scope of Greenberg's representation suggests it was related to challenging the Defendants' alleged discriminatory practices.

Indeed, Greenberg's letters to the Defendants in November and December 2012 make no mention of any discriminatory acts on the part of MMC or Dr. Devarajan. (See SAC, Ex. 8A–8H, Dkt. No. 22–23.) For example, in a December 28, 2012 email to Edmond Farrell, which is referred to in the SAC, Greenberg states: "I would sincerely appreciate if the vacation and moonlighting issues raised by [the Plaintiff] could be resolved at this time in a favorable way . . . . I understand that the focused review has come about on account of an incident in 2009. It is odd that that situation is being brought up now — on the eve of 2013!" (See id. at p. 12.)

Without any mention of discrimination in these communications, the Court finds that the Plaintiff fails to allege that she had a reasonable belief that she was "opposing an employment practice made unlawful by Title VII." Thus, the Plaintiff does not adequately allege she was engaging in protected activity by retaining Greenberg to obtain vacation days and moonlighting hours. See Roth v. Farmingdale Pub. Sch. Dist., No. 14CV6668 (JFB) (ARL), 2016 WL 767986, at *9 (E.D.N.Y. Feb. 26, 2016) ("The only mention of any activities engaged in before plaintiff applied for the provisional appointment was his allegation in his DHR complaint that he advocated for better security and surveillance systems, solar panels, and energy efficient stage lighting to be installed in 2010 . . . Such actions do not constitute protected activity under Title VII. Plaintiff has not alleged that he 'had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII.'") (quoting Kessler v. Weschester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 210 (2d. Cir. 2006)); Smith v. City of New York, No. 12 CIV. 3250 (JMF), 2013 WL 1903856, at *5 (S.D.N.Y. May 8, 2013) (dismissing a retaliation claim, in part, because the plaintiff "does not allege that she engaged in a protected activity, as she does not claim that she protested or opposed any incidents regarding her national origin"); Aiello v. Stamford Hosp. Inc., No. 3:09-CV-1161 (VLB), 2010 WL 3925451, at *5 (D. Conn. Sept. 29, 2010) ("Aiello's claim for retaliatory discharge must also fail as he does not allege that he engaged in protected activity, and as a result there is no allegation that Stamford Hospital was aware of any engagement, by him, in protected activity.").

Second, the Plaintiff alleges that the Defendants committed "retaliatory" actions against the Plaintiff, which are identical to those alleged with respect to her hostile work environment claim, namely:  (i) in 2010, an unidentified employee removed a bed from her office; (ii) in June 2013, an unidentified employee tampered with her office keys and locks; (iii) in December 2013, an unidentified employee changed her status in MMC's computer system from doctor to nurse; (iv) also in December 2013, an unidentified employee at MMC sent "spam" messages to other employees from her email account; (iv) in February 2014, after the Plaintiff filed a complaint with the EEOC, unidentified employees broke bookshelves in her office and threw "her belongings all over the office floor"; and (v) in August 2014, the Defendants terminated her employment.  (See SAC ¶¶ 60–69, 70–72, 157.)

Clearly, the Plaintiff's termination was an adverse action.  It is less clear whether the other four incidents were severe enough that they could plausibly "dissuade a reasonable worker from making or supporting a charge of discrimination."

However, even assuming all of these incidents constitute "adverse actions" recognizable under Title VII, the SAC does not plausibly link the actions to any "protected activity."  Indeed, the only affirmative "protected activity" identified by the SAC is the Plaintiff's decision on February 22, 2014 to file a charge of discrimination with the EEOC.  The first four incidents described above took place *before* the Plaintiff filed her charge, and therefore, they cannot plausibly be seen as retaliatory actions. See Sternkopf v. White Plains Hosp., No. 14-CV-4076 (CS), 2015 WL 5692183, at *9 n. 12 (S.D.N.Y. Sept. 25, 2015) ("In the end, absent any non-conclusory assertions that protected activity occurred before the adverse employment action, all of Plaintiff's retaliation allegations fail to meet the basic plausibility standard of Iqbal, 556 U.S. at 678."); Dansler-Hill v. Rochester Inst. of Tech., 764 F. Supp. 2d 577, 582 (W.D.N.Y. 2011) ("It is axiomatic that no such relationship can be found to exist where the alleged adverse employment action began and ended prior to the commencement of any protected

activity. Plaintiff's retaliation claim places the figurative cart before the horse, and it is therefore dismissed.").

With regard to the fourth incident, the Plaintiff alleges that:

[A]fter the filing of the said [EEOC] complaint, [the Plaintiff's] office had been ransacked. Her books and belongings were strewn all across the floor. [The Plaintiff's] shelves were broken. [The Plaintiff] immediately notified security at the Mercy Medical Center, a security officer with the Defendants, Mr. Guitierrez took pictures and made notes . . . and [u]ntil[] the [D]efendants terminated [the Plaintiff's] employment, nothing further was heard about the investigation.

(SAC at ¶ 61.)

In Vega, *supra*, the Second Circuit made clear that "[a] retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." 801 F.3d at 90. However, the SAC does not allege when her office was "ransack[ed]." As such, her allegations are far too vague to suggest that the incident would not have occurred absent a discriminatory motive on the basis of temporal proximity alone. See Wang v. Palmisano, 51 F. Supp. 3d 521, 541 (S.D.N.Y. 2014) ("Here, although Plaintiff has alleged the dates on which he filed his complaints, he has not alleged the dates on which Defendants rejected his applications, or even the dates on which he submitted his applications. Instead, the Complaint merely alleges that Defendants rejected his job applications 'after' he filed his complaints . . . . The Complaint's vague allegations therefore fail to give rise to a plausible inference that Defendants rejected him in retaliation for filing his FLSA claims."); Winston v. City of New York, No. 12-CV-0395 FB VVP, 2013 WL 4516097, at *4 (E.D.N.Y. Aug. 23, 2013) ("She alleges that 'shortly [ ]after ... processing an [internal Office of Equal Employment Opportunity] OEEO complaint for a female cleaner in the building,' Winston went on vacation, and upon her return 'she was removed from her Assistant ICO position.' . . . . This conclusory allegation is 'too vague in nature and non-specific as to time . . . to serve as a basis' for her retaliation claims.") (quoting Chandler v. AMR Am. Eagle Airline, 251 F.Supp.2d 1173, 1185 (E.D.N.Y. 2003)); Ayazi v. New York City Dep't of Educ., No. 08-CV-2456 (MKB), 2012 WL 4503257, at *7 (E.D.N.Y. Sept. 28, 2012) ("Although temporal proximity of events can give rise to an

inference of retaliation sufficient to establish causation, . . . 'the mere filing of such a complaint does not insulate an employee from subsequent discipline or discharge by his employer, nor create an automatic presumption that any subsequent employer action adverse to the employee is retaliatory in nature.'") (quoting <u>Spencer v. The Perrier Group of Am.</u>, No. 95 Civ. 8404, 1997 WL 282258, at *1 (S.D.N.Y. May 28, 1997)).

Moreover, the Plaintiff alleges that the Defendants responded to her complaint by sending a security officer to her office to take pictures and make notes.  (<u>See</u> SAC at ¶ 60.)  The fact that the Defendants conducted an initial investigation after the Plaintiff complained to them directly undermines the Plaintiffs' assertion that the Defendants were (a) responsible for "ransacking" the office; or (b) the Plaintiff's EEOC charge was a "but for" cause of the incident.

Finally, the Plaintiff's termination on August 21, 2014 occurred five months after the Plaintiff filed an EEOC charge.  Courts have held that a five month gap of time between the protected activity and the alleged retaliatory act renders a retaliation claim to be not plausible.  <u>See</u> <u>Olorode v. Streamingedge, Inc.</u>, No. 11 CIV. 6934 (GBD) (AJP), 2014 WL 1689039, at *19 (S.D.N.Y. Apr. 29, 2014) ("[D]istrict courts within this Circuit 'have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation.'") (quoting <u>Murray v. Visiting Nurse Servs. of N.Y.</u>, 528 F.Supp.2d 257, 275 (S.D.N.Y. 2007)); <u>Brundidge v. Xerox Corp.</u>, No. 12-CV-6157-FPG, 2014 WL 1323020, at *4 (W.D.N.Y. Mar. 31, 2014) (same).

Further, the Plaintiff acknowledges that she had been on FPPR probation since December 27, 2012 and was demoted on December 27, 2013.  (See SAC at ¶¶ 33, 46.)  She also attaches documents to the SAC which, as noted above, indicate that she had a long history of insubordination and poor patient management.  (<u>See</u> SAC, Ex. 10I, Dkt. No. 22–14, at 16.) These facts suggest that the Defendants had legitimate non-discriminatory reasons for firing the Plaintiff and therefore, undermine the plausibility of the Plaintiff's assertion that her filing of an EEOC charge was a "but for" cause of

her termination.  See Soloviev v. Goldstein, 104 F. Supp. 3d 232, 252 (E.D.N.Y. 2015) ("Plaintiffs acknowledge that Mr. Soloviev was under investigation for serious violations of NCAA bylaws at the time of his firing. Am. Complaint at ¶¶ 23, 24, 137, 186. This wholly undermines any argument that but-for the Blue Arrows petition, Mr. Soloviev would not have been fired.").

In sum, the Court finds that even construed as true, the Plaintiff fails to sufficiently allege that she suffered an adverse employment action because she opposed an unlawful employment practice. Therefore, the Court dismisses the Plaintiff's retaliation claim.

### 5. As to the FMLA Claim

The Plaintiff's claim under the FMLA is also deficient  The FMLA gives "eligible employee[s]" up to twelve weeks of unpaid leave to, as relevant here, "care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition."  29 U.S.C.A. § 2612(a)(1)(C).  A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves — (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  An "eligible employee" is "an employee who has been employed — (i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." Id. at § 2611(2)(A).

The FMLA provides a private right of action to an employee based on an employer's attempt to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  Id. at § 2615(a)(1); see also id. at § 2617(a)(1).  Regulations promulgated by the U.S. Department of Labor ("DOL") specify that "interference" encompasses "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."  29 C.F.R. §§ 825.220(b), (c). Interpreting this regulation, the Second Circuit has recognized private claims under the FMLA based on two separate theories:  (i) "interfering with the exercise of rights given by the FMLA"; and (ii)

"retaliating against those who make use of their FMLA rights."  Potenza v. City of New York, 365

F.3d 165, 168 (2d Cir.2004).

Significantly, a private plaintiff must initiate an FMLA claim "not later than 2 years after the

date of the last event constituting the alleged violation for which the action is brought."  29 U.S.C. §

2617(c)(1).  However, in the case of a "willful" violation of the FMLA, an "action may be brought

within 3 years of the date of the last event constituting the alleged violation for which such action is

brought."

The term, "willful," is not specifically defined in the FMLA.  However, in Porter v. New York

Univ. Sch. of Law, 392 F.3d 530 (2d Cir. 2004) (per curiam), the Second Circuit adopted a definition

of the term which it had previously applied to Fair Labor Standards Act claims — namely, "an

employer acts willfully when he or she 'knew or showed reckless disregard for the matter of whether

its conduct was prohibited by the [FLSA].'"  Id. (quoting McLaughlin v. Richland Shoe Co., 486 U.S.

128, 133, 108 S. Ct. 1677, 100 L.Ed.2d 115 (1988)).  The Circuit Court added, "[i]f an employer acts

reasonably in determining its legal obligation, its action cannot be deemed willful . . . If an employer

acts unreasonably, but not recklessly, in determining its legal obligation, then . . . it should not be . . .

considered [willful.]" Id. (alteration in original) (quoting McLaughlin, 486 U.S. at 135 n.13).

Here, the Plaintiff's FMLA claim is premised on the allegation that "[the] Defendants denied

[the] [P]laintiff use of her accrued vacation time to visit and care for her daughter who lived far away,

was expecting her first baby with a complicated pregnancy, despite repeated pleas and considerable

notice provided by the [P]laintiff."  (SAC at ¶ 188.)

The Defendants assert that the Plaintiff's claim is time-barred because (i) the SAC does not

contain any allegation suggesting willfulness on the part of the Defendants and therefore, the two-year

statute of limitations applies; and (ii) "the facts underlying [the] Plaintiff's FMLA claim occurred prior

to April 20, 2013, which is two years prior to the Plaintiff's filing of the present action."  (The Defs.'

Mem. of Law, Dkt. No. 21, at 4.)

The Plaintiff does not address the Defendants' timeliness argument in her opposition memorandum, nor in her memorandum in support of her motion to amend. (See the Pl.'s Opp'n Mem. of Law, Dkt. No. 25, at 16; the Pl.'s Mem. of Law, Dkt. No. 22-1, at 3.)

The Plaintiff's failure to address the Defendants' timeliness argument is, by itself, grounds for dismissal. See Martinez v. City of New York, No. 11 CIV. 7461 (JMF), 2012 WL 6062551, at *1 (S.D.N.Y. Dec. 6, 2012) ("A court 'may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.'") (quoting Lipton v. Cnty of Orange, N.Y., 315 F.Supp.2d 434, 446 (S.D.N.Y. 2004); see also Robinson v. Fischer, No. 09 CIV. 8882 (LAK) (AJP), 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010) ("Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers defendants' arguments for dismissing such a claim.").

In any event, even if not abandoned, the Court agrees that the Plaintiff's claim is time-barred. As the Defendants correctly point out, the SAC makes no mention of the Plaintiff giving the Defendants notice of her intention to take leave under the FMLA. Rather, the SAC alleges that in August 2012, the Plaintiff asked Dr. Devarajan for "vacation time to be with her daughter who was expecting a baby and was having health problems." (SAC at ¶ 29.) A request for *paid* vacation time is, of course, far different than a request for unpaid leave pursuant to the FMLA. Thus, without any allegation suggesting that the Plaintiff gave notice to the Defendants that she was attempting to vindicate a right under the FMLA, it is not plausible to conclude that the Defendants "showed reckless disregard for the matter of whether its conduct was prohibited by the [FMLA]." Porter, 392 F.3d at 532.

Furthermore, the emails attached to the SAC indicate that Dr. Devarajan and Cianciotto denied the Plaintiff's request for vacation time because another doctor was scheduled to give birth during that time, leaving MMC's neonatology department, which consisted of only three doctors, short-staffed.

(See SAC, Ex. 7A, Dkt. No. 22–13, at 3.) Moreover, the Plaintiff admits that the Defendants ultimately granted her request to go on vacation in February 2013. Thus, she was not denied any vacation benefits. (See SAC at ¶ 36.) These allegations clearly suggest that the Defendants' response to the Plaintiff's vacation request was reasonable and was not reckless or willful. See Porter, 392 F.3d at 531 ("If an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful.") (internal quotation marks and citations omitted).

Therefore, the Court agrees that the two-year statute of limitations applies to the Plaintiff's FMLA claim. The Plaintiff commenced this action on April 20, 2015. Accordingly, any claims based on acts that occurred prior to April 20, 2013 are time-barred.

As noted, the Plaintiff's FMLA claim is premised on the Defendants' decision to deny the Plaintiff's August 2012 request for vacation and therefore, the Plaintiff's apparent FMLA interference claim arising from that decision is time-barred. (See SAC at ¶ 188.)

Further, although not alleged in the SAC, in her legal memorandum, the Plaintiff appears to suggest that she was also subject to retaliation for requesting vacation. (The Pl.'s Mem. of Law, Dkt. No. 22–1, at 3.) However, the only acts of alleged retaliation remotely linked to the Plaintiff's August 2012 request for vacation are: (i) in December 27, 2012, she was put on FPPR probation; and (ii) in February 2013, after returning from vacation, she was subject to "a continued barrage of accusations, allegations and hostility." (See id. at ¶¶ 33, 36.) Even assuming that the Plaintiff asserts an FMLA retaliation claim based on these incidents, that claim is premised on alleged acts which occurred prior to April 20, 2013 and therefore, are also time-barred.

Accordingly, the Plaintiff's FMLA claim is time-barred and hereby dismissed.

**6. As to the Plaintiff's Health Care Quality Improvement Act Claim**

In the SAC, the Plaintiff seeks to add a claim styled as a "violation of Due Process" claim under the HCQIA." (SAC at ¶ 180.) Specifically, she alleges that "[t]he Defendants suspended [the] Plaintiff's medical privileges and terminated her employment without a hearing, thus denying the

Plaintiff a property right without affording her an opportunity to be heard and to defend herself in violation 42 U.S.C. § 11111(a) and § 11112(a)."  (Id.)

"HCQIA was enacted 'to improve the quality of medical care by restricting the ability of physicians who have been found to be incompetent from repeating this malpractice by moving from state to state without discovery of such finding.'"  Tabrizi v. Faxton-St. Luke's Healthcare, No. 6:10-CV-1475, 2011 WL 6842989, at *3 (N.D.N.Y. Dec. 29, 2011) (citing Health Care Improvement Imperial v. Suburban Hosp. Ass'n, Inc., 37 F.3d 1026, 1028 (4th Cir. 1994)).  "Toward this end, the Act establishes a national reporting system 'to follow bad doctors from place to place,'. . . , and provides immunity from damages for persons participating in professional review activities."  Imperial, 37 F.3d at 1028 (quoting H. R. Rep. No. 903, 99th Cong. 2d Sess. (1986)).

The Plaintiff provides no legal authority recognizing a claim under the HCQIA for improperly "suspending a doctor's medical privileges."

Further, as the Defendants correctly note, a myriad of courts have found that the "HCQIA does not provide a private cause of action through which a physician can seek relief for violations of that statute."  Tabrizi, 2011 WL 6842989 at *3; see also Singh v. Blue Cross/Blue Shield of Massachusetts, Inc., 308 F.3d 25, 45 n.18 (1st Cir. 2002) ("Dr. Singh also claims that Blue Cross violated his rights by failing to satisfy the requirements of the HCQIA. However, the HCQIA does not create a private cause of action."); Hancock v. Blue Cross-Blue Shield of Kansas, Inc., 21 F.3d 373, 375 (10th Cir. 1994) ("Since the court concludes that the HCQIA was not enacted to benefit physicians subject to peer review, such as plaintiff, plaintiff cannot persuade the court that an implied cause of action exists for him under the HCQIA."); Zoher v. NHC Healthcare Sys., Inc., No. 2:11-CV-00086-FTM-29, 2011 WL 5525338, at *2 (M.D. Fla. Nov. 14, 2011) ("The Eleventh Circuit, as well as other circuits, has held that there is no private cause of action under HCQIA to a physician in connection with the peer review process.") (citing Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1083 (11th Cir. 2005)).

Based on this authority, the Court declines to recognize a private cause of action under the HCQIA and finds that the Plaintiff's proposed claim is futile. Accordingly, the Court denies the Plaintiff's motion to amend to add such a claim.

### 7. As to the State Law Claims

Finally, count 10 of the SAC asserts state law claims against the Defendants for "libel, slander, and intentional infliction of emotional distress." (SAC at ¶¶ 189–194.)

The Defendants assert that the claims are untimely, insufficiently plead, and barred by privilege. (The Defs.' Mem. of Law, Dkt. No. 21, at 6–9.)

In response, the Plaintiff does not address the Defendants' timeliness or privilege arguments and instead focuses her opposition solely on the sufficiency of her claims. (The Pl.'s Mem. of Law, Dkt. No. 25, 13–14, 18–19.)

The Court need not address these arguments because the Court has granted the Defendants' motion to dismiss and denied the Plaintiff's motion to amend with regard to all the federal claims asserted in this action. 28 U.S.C. § 1367(c) gives district courts discretion to "decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." Jurisdiction in this case was predicated solely on the Plaintiff's federal claims and not on another basis of jurisdiction, such as diversity of citizenship. (See SAC at ¶ 7) (stating that "[t]he jurisdiction of this court is invoked pursuant to the Civil Rights Act of 1964 . . . and for federal claims pursuant to 28 U.S.C. § 1331 and over state claims pursuant to 28 U.S.C. § 1367.").

Therefore, having dismissed all of the Plaintiff's federal claims at an early stage of the litigation, the Court finds it would be inappropriate to exercise supplemental jurisdiction over the Plaintiff's state law claims. See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 1139, 16 L. Ed. 2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); Traore v. Police Office Andrew Ali Shield, No. 14 CIV. 8463 (ER), 2016 WL 316856, at *8 (S.D.N.Y.

Jan. 26, 2016) ("Having dismissed all of Plaintiff's federal claims under Rule 12(b)(6) as untimely it would be inappropriate to adjudicate his state law claims."); Bank v. Uber Techs. Inc., No. 15-CV-4858 (JG), 2015 WL 8665441, at *3 (E.D.N.Y. Dec. 11, 2015) ("Having granted Uber's motion to dismiss Bank's TCPA claims, I decline to exercise supplemental jurisdiction over the alleged violation of NYGBL § 399-p."); West v. Moe's Franchisor, LLC, No. 15CV2846, 2015 WL 8484567, at *4 (S.D.N.Y. Dec. 9, 2015) ("'It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims.'") (quoting Klein & Co. Futures, Inc. v. Bd. of Trade, 464 F.3d 255, 262 (2d Cir. 2006)).

Accordingly, the Court also dismisses the Plaintiff's state law claims.

In sum, the Court finds that the proposed SAC fails to state any viable causes of action. Therefore, the Court grants the Defendants' motion to dismiss the FAC in its entirety and denies the Plaintiff motion to amend the FAC as futile. The Court will now turn to the Defendants' motion to seal.

**B. As to the Defendants' Motion to Seal**

The conduct of the Plaintiff and Ike Agwuegbo, Esq., her counsel, with regard to the medical records in this case is troubling.

"[I]t is well established that the public and the press have a "qualified First Amendment right to attend judicial proceedings and to access certain judicial documents.'" Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 120 (2d Cir. 2006). However, "[a] court's conclusion that a qualified First Amendment right of access to certain judicial documents exists does not end the inquiry. '[D]ocuments may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" Id. (emphasis in original) (quoting Matter of New York Times Co., 828 F.2d 110, 116 (2d Cir. 1987)).

HIPAA and the accompanying regulations promulgated by the Department of Health Services ("DOH") keep from disclosure "protected health information" related to the "treatment, payment, or healthcare operation." 45 C.F.R. § 164.502(a). The term "health information" covers, among other things, "past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual." Id. at § 160.103. The DOH regulations permit health care providers, such as the Plaintiff, to disclose protected health information in the context of litigation proceedings under limited circumstances when, as relevant here, he or she "excludes" a patient's identifiable information, such as: (i) names; (ii) postal address information; (iii) telephone numbers; (iv) medical record numbers; (v) account numbers; and (v) "other unique identifying number, characteristic, or code, except as permitted by paragraph (c) of this section[.]"

Courts in this Circuit have repeatedly held that information protected by HIPAA is not subject to a First Amendment or common-law right of access and thus have sealed docket entries and redacted documents that contain such information. See Tavares v. Lawrence & Mem'l Hosp., No. 3:11-CV-770 CSH, 2012 WL 4321961, at *11 (D. Conn. Sept. 20, 2012) ("The parties are reminded that, pursuant to the Health Insurance Portability and Accountability Act of 1996 ('HIPAA'), Pub. L. No. 104–191, 110 Stat.1936, 45 C.F.R. § 164.512, et seq., information exchanged between them during discovery is not subject to a First Amendment or common-law public right of access. Thus, discovery involving the Tavares's marital therapy records should in no way disclose these records to the public."); Dilworth v. Goldberg, No. 10-CV-2224 JMF, 2014 WL 3798631, at *2 (S.D.N.Y. Aug. 1, 2014) ("Exhibits S, T, and Z were properly redacted, as they comprised Plaintiff's private medical records."); Hand v. New York City Transit Auth., No. 11-CV-997 (RRM) (MDG), 2012 WL 3704826, at *5 (E.D.N.Y. Aug. 26, 2012) ("Federal law generally treats medical records as confidential . . . . Thus, plaintiff's motion to seal is granted in part with respect to portions of dockets sheets that include the aforementioned Employee Medical History & Physician's Certification Form."); Wheeler-Whichard v. Doe, No. 10-

CV-0358S, 2010 WL 3395288, at *7 (W.D.N.Y. Aug. 25, 2010) ("The Court notes, however, that this Court and other district courts routinely file medical records under seal, without sealing the action or having plaintiff proceed under a pseudonym, to protect plaintiff's privacy interests in his medical records and, therefore, plaintiff's medical records only shall be sealed."); Northrop v. Carucci, No. 304-CV-103 (RNC), 2007 WL 685173, at *3 n.6 (D. Conn. Mar. 5, 2007) ("The record contains over 800 pages of plaintiff's medical records . . . . No motion to seal them has been filed. Courts ordinarily apply a strong presumption against sealing court records . . . . However, federal law treats medical records as confidential. See Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub.L. 104–191 (1996). Therefore, plaintiff's medical records will be sealed by the Clerk.")

In addition, Fed. R. Civ. P. 5.2 requires a party, subject to certain exceptions not relevant here, to redact an individual's (i) "taxpayer-identification number" by including only "the last four digits" of the "taxpayer identification number"; (ii) "birth date" by including only the "year of the individual's birth"; and (iii) the "name of an individual known to be a minor" by substituting "the minor's initials."

When confronted with confidential private information, Fed. R. Civ. P. 5.2(d) gives a district authority to (i) "order that a filing be made under seal without redaction"; or (ii) "order the person who made the filing to file a redacted version for the public record."

Here, the Plaintiff included in her complaint and FAC allegations related to so-called "quality care issues at MMC," which detail the treatment of newborns by the Plaintiff and Dr. Devarajan. In addition, she attached to the complaint and FAC 285 pages of documents, which included medical records that were only partially redacted. For example, some of the documents contained full medical record numbers, treatment dates, partial addresses of patients, the names of treating physicians, and details concerning patients' medical conditions and care.

As the Court discussed earlier, these allegations and documents are completely irrelevant to the Plaintiff's discrimination claims. More importantly, they are also clearly protected by HIPAA and

Fed. R. Civ. P. 5.2(a) and thus, should never have been filed by the Plaintiff and Agwuegbo on a publicly accessibly docket.

Prior to filing this motion, the Defendants' counsel notified Agwuegbo of these issues and offered to file redacted pleadings and documents which removed the offending information. Unfortunately, Agwuegbo refused to do so, citing his mistaken belief that "[t]he majority of redactions your Firm seeks, we believe are not HIPAA protected." (Gegwich Decl., Ex. B.)

As a result, the Defendants were forced to file a motion to seal, asserting correctly that the complaint and the FAC contained unredacted confidential health and personal information, the disclosure of which violates HIPAA and Fed. R. Civ. P. 5.2(a). To deal with the issue, the Defendants request that the Court issue an order directing the Clerk of the Court to seal the complaint and amended complaint and file in their place the proposed redacted versions attached to their present motion.

Instead of agreeing to this reasonable proposal, the Plaintiff compounded the problem by submitting a cross-motion to amend (Dkt. No. 22), which contained 648 pages of documents and included full medical record numbers, partial dates of birth of MMC's infant patients, and other information subject to redaction and protected under HIPAA. In addition, the Plaintiff submitted the same 648 pages of documents to her opposition to the Defendants' present motion to seal. Further, the Plaintiff appended 733 pages of partially redacted documents to her opposition to the Defendants' motion to dismiss and 593 pages of similar documents to her reply memorandum in support of her cross-motion to amend. (See Dkt. Nos. 23, 25, 31.)

Even more perplexing, in her opposition memorandum, the Plaintiff concedes that the following information is subject to redaction — of 1) Patient Names; 2) Patient Telephone Numbers; 3) Social Security Numbers; 4) Dates of Birth 5) Account Numbers; 6) Other Personal Identifiers — and that she "overlooked" this information when originally making redactions. (See The Pl.'s Mem. of Law, Dkt. No. 23, at 14–15.) Yet instead of fixing the problem, she continued to file documents with unredacted confidential patient information.

In her memorandum, the Plaintiff also does not address the issue of HIPAA, Fed. R. Civ. P. 5.2, or the great weight of legal authority supporting the Defendants' position. Instead, she states that "the issue of quality of care at the NICU at [M]ercy Medical Center will remain a central issue in this case," without offering any explanation or support for that statement. (Id.)

In short, based on the weight of authority described above and the lack of any coherent explanation offered by the Plaintiff, the Court finds that the personal and identifying information of the Plaintiff's patients, as well as the other unredacted confidential information identified by the Defendants, is protected under HIPAA and Fed. R. Civ. P. 5.2(a) and therefore, overcomes the presumptive common-law right of access to judicial documents. Accordingly, the Court grants the Defendants' motion to seal docket entries 1, 15, 22, 23, 25, and 31. In place of docket entries 1 and 15, the Court directs the Clerk of the Court to file the redacted versions of the complaint and first amended complaint attached as Exhibits C and D to the Defendants' motion to seal. The remaining docket entries will remain under seal.

### III. CONCLUSION

For the foregoing reasons, the Court (i) grants the Defendants' motion to dismiss the FAC in its entirety, with prejudice; (ii) denies the Plaintiff's cross-motion to amend the FAC as futile; and (iii) grants the Defendants' motion to seal.

The Court further directs the Clerk of the Court to (i) seal docket entries 1, 15, 22, 23, 25, and 31; (ii) link to docket entries 1 and 15 and publicly file solely the redacted versions of the complaint and first amended complaint attached as Exhibits C and D to the Defendants' motion to seal, contained in docket entry 17; and (iii) stay entry of judgment in this case pending the Court's decision on the parties' cross-motions for sanctions.

Finally, the Court advises the Plaintiff and her counsel that any future filings in this Court must comply with the requirements of HIPAA and Fed. R. Civ. P. 5.2. Failure to so file will only increase the likelihood that the Court will grant the Defendants' present motion for sanctions.

**SO ORDERED.**

Dated: Central Islip, New York
March 10, 2016

        _/s/ Arthur D. Spatt_
        ARTHUR D. SPATT
        United States District Judge